IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 04-cr-00403-LTB

UNITED STATES OF AMERICA,

       Plaintiff,

v.

1.  CARLOS ZAPATA-HERNANDEZ,
2.  SERGIO ZAPATA-HERNANDEZ, a/k/a "Tito,"a/k/a "Titillo," and
   a/k/a "Lucas,"
3.  FABIAN MIRANDA-URBINA, a/k/a "Chino,"
4.  ARNOLDO ZAPATA, a/k/a "Lolo,"
5.  JOSE ALFREDO ZAPATA, a/k/a "Alfredo,"
6.  JAIME ARMENDARIZ,
7.  RAMON ZAPATA,
8.  JAIME ZAPATA, a/k/a "Rudy,"a/k/a "Jimmy," and a/k/a
   "Chasco,"
9.  EFRAIN VENZOR,
10. ALBERTO CABRAL, a/k/a "Beto," and a/k/a "Tio Beto,"
11. ARTEMISA ZAPATA-MONTOYA,
12. HUMBERTO GALVAN, a/k/a "Beto,"
13. LILIAN GALVAN, a/k/a "Petunia," and a/k/a "Yiya,"
14. BARBARA ZAPATA,
15. OSCAR ZAPATA, a/k/a "Karin,"
16. MICHAEL ROMERO, a/k/a "Mike,"
17. RENE ALVAREZ,
18. JOSE ANGEL PEREZ, and a/k/a "Primo,"

       Defendants.

---

GOVERNMENT'S RESPONSE TO DEFENDANTS' CONSOLIDATED
MOTION TO SUPPRESS INTERCEPTED WIRE COMMUNICATIONS
(FILED AT DOCKET NUMBER 556-1)

---

NOW COMES THE UNITED STATES OF AMERICA, WILLIAM J.
LEONE, United States Attorney, by Stephanie Podolak, Assistant
United States Attorney, and files this response to the
defendants' consolidated Motion To Suppress Wire Communications
which is filed at Docket Number 556-1.

1

I.    **BACKGROUND OF CASE**

This investigation began in January 2000, and continued until August 23, 2004, the date of arrests.  At trial, the government will show that all the evidence obtained during the investigation established that, during the time period alleged in the indictment, CARLOS ZAPATA-HERNANDEZ was operating a large-scale narcotics trafficking operation in the Denver metropolitan area (hereinafter the "ZAPATA-HERNANDEZ TARGET ORGANIZATION"). It should be noted that most of the members of the ZAPATA-HERNANDEZ TARGET ORGANIZATION had familial ties.  Unindicted co-conspirator JULIANITA ZAPATA is the mother of six sons, indicted defendants CARLOS ZAPATA-HERNANDEZ, SERGIO ZAPATA-HERNANDEZ, JAIME ZAPATA, OSCAR ZAPATA, JOSE ALFREDO ZAPATA and ARNOLDO ZAPATA, and two daughters, indicted defendants ARTEMISA ZAPATA-MONTOYA and LILIAN GALVAN.  Indicted defendant ALBERTO CABRAL is referred to as the uncle of the ZAPATA-HERNANDEZ children. Indicted defendant RAMON ZAPATA is the son of JOSE ALFREDO ZAPATA and nephew to the other ZAPATA-HERNANDEZ brothers.  Indicted defendant FABIAN MIRANDA-URBINA is referred to as a cousin. Indicted defendant BARBARA ZAPATA is CARLOS ZAPATA-HERNANDEZ's wife.  Indicted defendant HUMBERTO GALVAN is LILIAN GALVAN's husband.

CARLOS ZAPATA-HERNANDEZ negotiated directly with Mexican sources of supply and also traveled to Mexico in order to arrange for and facilitate the importation of loads of cocaine into the United States.  The cocaine shipments were secreted inside the spare tires of load vehicles with each tire containing any where from 5 to 9 kilograms of cocaine.  The loads would be driven from Mexico to El Paso, Texas, and delivered to members of the ZAPATA-HERNANDEZ organization who resided in that area. Members of the conspiracy, who lived in Denver, would travel to El Paso, obtain the load vehicles, and transport the drugs to Colorado.  The spare tires would be off-loaded at residences owned by members of the conspiracy which were used as stash locations.  CARLOS ZAPATA-HERNANDEZ would then direct the distribution of the cocaine to various individuals within the conspiracy.  Drug proceeds would ultimately be collected, again secreted in the spare tires, and driven back to Mexico by members of the organization.

Although it is clear that the Mexican leadership maintained ultimate command and control of this organization, the evidence will show that CARLOS ZAPATA-HERNANDEZ directed the members of this organization within the Denver Colorado area.

The evidence will first show that unindicted co-conspirators PRIMO LNU, who resided in Mexico, was a source of supply to CARLOS ZAPATA-HERNANDEZ.  The two men engaged in

numerous conversations about the quantity and price of the shipped cocaine.  Conversations also revealed that CARLOS ZAPATA-HERNANDEZ traveled to Mexico on several occasions during the course of the conspiracy to meet with PRIMO.

The wiretap evidence and surveillance will show that, once the cocaine crossed the border, it was delivered to either ARNOLDO ZAPATA or JOSE ALFREDO ZAPATA, both of whom resided in the El Paso area.  Conversations reveal that ARNOLDO ZAPATA and JOSE ALFREDO ZAPATA had direct knowledge of when the cocaine would be arriving in El Paso, how much cocaine was being sent, and who would be responsible for transporting the narcotics to Denver.  Defendant JAIME ARMENDARIZ and unindicted co-conspirator HUGO ARMENDARIZ assisted the El Paso brothers in loading and packaging the cocaine for transport.

The evidence will prove that several transporters from Denver traveled to El Paso to pick up the load vehicles from ARNOLDO ZAPATA and JOSE ALFREDO ZAPATA.  For example, in the beginning of April 2004, wire interceptions and surveillance identified ALBERTO CABRAL as transporting a load of cocaine from El Paso, Texas into the Denver area.  Later intercepted conversations also revealed that defendants ARTEMISA ZAPATA-MONTOYA, HUMBERTO GALVAN, LILIAN GALVAN and RAMON ZAPATA, along with unindicted co-conspirators JULIANITA ZAPATA and DANIEL LNU, were transporters of narcotics for the TARGET ORGANIZATION.

4

In fact, the government will present evidence which shows that on August 27, 2004, HUMBERTO GALVAN, LILIAN GALVAN and JULIANITA ZAPATA were stopped during one of the drug runs and 8 ½ kilograms of cocaine were found hidden inside the spare tire of their vehicle.

The evidence at trial will also demonstrate that SERGIO ZAPATA-HERNANDEZ and FABIAN MIRANDA-URBINA, a/k/a "CHINO" were at the center of CARLOS ZAPATA-HERNANDEZ' drug organization and acted as CARLOS ZAPATA-HERNANDEZ' primary assistants and underlings in the drup operation.  When the loads of narcotics arrived in the Denver area, CARLOS ZAPATA-HERNANDEZ' first contacts were to SERGIO ZAPATA-HERNANDEZ and CHINO.  These two defendants would help facilitate the off-loading of the spare tires, were aware of the cocaine's quality, quantity and price, distributed cocaine to major customers of the organization and also assisted CARLOS ZAPATA-HERNANDEZ in the collection of narcotics proceeds and the storing of drugs and money belonging to TARGET ORGANIZATION.  Moreover, when CARLOS ZAPATA-HERNANDEZ traveled outside of Denver, SERGIO ZAPATA-HERNANDEZ or CHINO would be in charge of the TARGET ORGANIZATION business.

Intercepted wire communications, coupled with visual surveillance, will show that CARLOS ZAPATA-HERNANDEZ had a limited number of customers who purchased a substantial amount of cocaine directly from him on a regular basis.  These customers

5

include defendants MIKE ROMERO, RENE ALVAREZ and unindicted co-
conspirator JESUS MEJIA.

The evidence will also show that EFRAIN VENZOR was a
distributor within the CARLOS ZAPATA-HERNANDEZ organization.
Intercepted conversations revealed that EFRAIN VENZOR would make
direct contact with CARLOS ZAPATA-HERNANDEZ to receive his supply
of cocaine.  There were a few occasions when EFRAIN VENZOR would
contact CHINO to receive cocaine for distribution.  During these
few contacts, it was learned that the reason VENZOR did not want
to contact CARLOS ZAPATA-HERNANDEZ directly was due to the fact
that CARLOS ZAPATA-HERNANDEZ was upset with and untrusting of
VENZOR at that time because of his excessive drinking.

The evidence presented at trial will also show that
JAIME ZAPATA was a distributor for the organization.  The wire
interceptions showed JAMIE ZAPATA speaking directly with CARLOS
ZAPATA-HERNANDEZ when needing a supply cocaine.

The wiretap interceptions showed that BARBARA ZAPATA,
wife of CARLOS ZAPATA-HERNANDEZ, assisted her husband in hiding
drug proceeds and narcotics in their home.  Likewise, unindicted
co-conspirator ROSA ZAPATA assisted her husband SERGIO ZAPATA-
HERNANDEZ by collecting money and distributing funds to other
members of the conspiracy.

The wiretap and other evidence will show that OSCAR
ZAPATA received loads of cocaine at this residence in Denver and
allowed his residence to be used as a stash location for the

ZAPATA-HERNANDEZ TARGET ORGANIZATION.

The evidence will demonstrate that SERGIO ZAPATA-HERNANDEZ and CHINO also had their own distribution network for the cocaine supplied by CARLOS ZAPATA-HERNANDEZ.  One of the customers was JOSE ANGEL PEREZ.  Five controlled purchases of cocaine were completed with PEREZ prior to the initial wire interceptions.

II.   **THE RELEVANT WIRETAPS**

As set forth in pages 3 through 8 of the defendants' consolidated Motion To Suppress Wiretaps, there were six telephones which were the subject of electronic surveillance (identified as SUBJECT CELLULAR TELEPHONES ONE, SUBJECT CELLULAR TELEPHONE TWO, SUBJECT CELLULAR TELEPHONE THREE, SUBJECT CELLULAR TELEPHONE FOUR, SUBJECT CELLULAR TELEPHONE FIVE AND SUBJECT CELLULAR TELEPHONE SIX.  There were also several renewals of SUBJECT CELLULAR TELEPHONE TWO and SUBJECT CELLULAR TELEPHONE THREE.  The government adopts the descriptions of these various wiretaps as set forth in the defendants' motion.  Rather than re-attach the Exhibits, the government also adopts Exhibits 1 through 30 which are attached to the defendants' motion.  The government will refer to the same Exhibit numbers referenced by the defendants in this response.

III. **ARGUMENT**

    1.   Defendant's Grounds For Suppression

        In their motion, the defendants make the following argument.  The defendants assert that the government claimed it needed to secretly listen to the phone conversations of the defendants because of the failure of normal investigative techniques such as surveillance, informants, search warrants and grand juries.  The defendants then argue that there was no necessity for the wiretap because the "so-called normal investigative techniques were working well" and the government had achieved the goals of the investigation before the wiretap commenced.

        In support of this contention, the defendants point to the fact that the government: (1) had seized two multiple kilogram shipments from co-conspirators JESUS MEJIA and KENNETH LYONS; (2) had made numerous recorded drug purchases; (3) had successfully used an undercover agent to infiltrate the organization; (4) had information provided by CS-1 regarding prior drug transactions by the ZAPATA-HERNANDEZ TARGET ORGANIZATION; and (5) had introduced a confidential source (CS-FBI) to TARGET ORGANIZATION member JOSE ANGEL PEREZ.  According to the defendants, these early successes achieved the goals of the investigation because the hierarchy of the organization had been identified, cases had been against members of the organization, significant quantities of drugs had been seized and

8

cooperation and confessions from co-defendants had been obtained.

The defendants then contend that, despite these successes, the government speculated in a boiler-plate fashion as to why traditional methods would not work to achieve the objectives of the investigation.  The defendants also suggest that, because the first wiretap affidavit fails to meet necessity, all succeeding wiretaps also should be suppressed.

Finally, the defendants claim that they are entitled to an evidentiary hearing on necessity rather than an analysis of four corners of the wiretap affidavits.  For the reasons set forth below, these arguments should be denied.

2.   Government's Response

The government asserts that the defendants' motion to be suppressed fails for two reasons.  First, as a matter of fact, the "successes" delineated by the defendants did not and could not have achieved the objectives of the investigation.  Detailed discussions of why these limited successes were insufficient to meet the overall objectives were set forth in the wiretap affidavits and these arguments were accepted by United States District Judge Zita Weinshienk who authorized the interceptions.

Second, while there was some success prior to the initiation of the wiretaps, these successes were partial and not complete. As a matter of law, partial success does not invalidate the need for a wiretap.

Lastly, as a matter of law, the defendants are not entitled to an evidentiary hearing on whether the government established necessity for the wiretap.

A.   The Target And Objectives Of The Investigation

As set forth in paragraphs 9(a) through (c), of Exhibit 2, the "target" of the investigation was not defined by a single person or persons but was rather defined as the entire CARLOS ZAPATA-HERNANDEZ drug distribution organization (the "ZAPATA-HERNANDEZ TARGET ORGANIZATION") which distributed cocaine and marijuana in the Denver, Colorado, area as well as to cities in the Eastern United States. Paragraphs 9(d) 1-6 of Exhibit 2 then goes on to define the objectives of the investigation which were obtain and disclose admissible evidence of:

> (1)   Information leading to the identification of individual(s) who assist in the importation of narcotics for the TARGET ORGANIZATION:
>
> (2)   Information leading to the identification of individual(s) who assist in the distribution of controlled substances for the TARGET ORGANIZATION;
>
> (3)   Information leading to the identification of the person(s) distributing and transporting controlled substances for the TARGET ORGANIZATION;
>
> (4)   Information leading to the identification of the time(s) and location(s) of meetings during which the members of the TARGET ORGANIZATION deal with and discuss the importation, purchase and sale of controlled substances;
>
> (5)   The identification of other communication facilities utilized by member of the TARGET ORGANIZATION in furtherance of the criminal activity alleged herein; and

10

(6)  The time(s) of importation into, and the delivery
of the controlled substances to individuals within the
District of Colorado and elsewhere."

No single objective was listed as being any more or
less important or significant than the others.

B.  The Defendants' Arguments Are Factually Incorrect

1.  The Seizures From Mejia and Lyons

The defendants first claim that the December 11, 2003,
seizure of 24 kilograms of cocaine from KENNETH LYONS and LETTY
SIERRA DE MALDONADO and the connected February 13, 2004, seizure
of 12 kilograms from JESUS MEJIA, was enough to implicate
defendant CARLOS ZAPATA-HERNANDEZ, the leader of the TARGET
ORGANIZATION, in the drug conspiracy.

a.  The Information Provided By Mejia

As set forth in paragraphs 49-71 of Exhibit 2, JESUS
MEJIA did provide extensive information regarding CARLOS ZAPATA-
HERNANDEZ.  During two separate interviews, MEJIA stated he has
been purchasing large quantities of cocaine from CARLOS ZAPATA-
HERNANDEZ and that he met CARLOS ZAPATA-HERNANDEZ approximately
three years ago when they both had been living in Denver.  MEJIA
stated that he moved to the Washington D.C. area, but had
continued to purchase multi-kilogram quantities of cocaine from
CARLOS ZAPATA-HERNANDEZ even after the move.  MEJIA told the DEA
agent that he traveled from Washington, D.C., to Denver on 20 to
30 occasions and purchased approximately 10 to 30 kilograms of

11

cocaine each trip.  MEJIA stated that, over the past two years, he averaged three trips to Denver each month.  MEJIA stated that he typically drove to CARLOS ZAPATA-HERNANDEZ' residence and parked in the garage.  CARLOS ZAPATA-HERNANDEZ then loaded the cocaine into traps in the vehicle or into the vehicle's spare tire.  MEJIA indicated that he also had other individuals who drove loads from Denver to Washington, D.C.  MEJIA advised that his mother LETTY SIERRA DE MALDONADO had been arrested with KENNETH LYONS in December 2003, while driving a load of cocaine supplied by CARLOS ZAPATA-HERNANDEZ.

MEJIA advised that 3½ years ago, MEJIA met an individual named NOEL LNU, believed to be a cousin of CARLOS ZAPATA-HERNANDEZ.  NOEL LNU told MEJIA that he could supply him with large quantities of cocaine. In December 2000, NOEL LNU took MEJIA to a construction business in Sheridan, Colorado, which is owned by ZAPATA-HERNANDEZ.  While at the business, MEJIA purchased three kilograms of cocaine from CARLOS ZAPATA-HERNANDEZ. MEJIA stated that he met CARLOS ZAPATA-HERNANDEZ at the construction company several more times and would purchase anywhere from three to ten kilograms of cocaine every two weeks. After several deals, CARLOS ZAPATA-HERNANDEZ indicated that he no longer wanted to do deals at the construction site and asked MEJIA to come to his home.  MEJIA advised that he did not know the exact address of CARLOS ZAPATA-HERNANDEZ's home but gave directions which indicated the known residence of CARLOS ZAPATA-

HERNANDEZ on 6575 Meade Court, Arvada, Colorado.

MEJIA indicated that he then starting making regular visits to CARLOS ZAPATA-HERNANDEZ's residence, and making purchases of multiple kilograms of cocaine. MEJIA noted that, for the past year, he had been sending runners to meet with CARLOS ZAPATA-HERNANDEZ and that the runners would call ZAPATA-HERNANDEZ to advise that they were in the area. ZAPATA-HERNANDEZ would direct them to his residence and load the drugs to spare tires. MEJIA stated that ZAPATA-HERNANDEZ kept the tools to prepare the spare tires inside his garage.

MEJIA described the cocaine supplied by CARLOS ZAPATA-HERNANDEZ as being wrapped with a rubber seal and further wrapped in black or brown tape. The kilograms were stamped with different markings including hearts, crocodiles, 8888 or goblets. MEJIA reiterated that the 12 kilograms of cocaine seized on February 12, 2004, came from CARLOS ZAPATA-HERNANDEZ. MEJIA advised that ZAPATA-HERNANDEZ had indicated that he kept records from his drug trafficking in the upstairs of his residence.

        b.   <u>Mejia's Information Was Not Sufficient To Meet The Objectives Of The Investigation</u>

The government does not contest the fact that the information provided by JESUS MEJIA shed a great deal of light on target CARLOS ZAPATA-HERNANDEZ. Based on MEJIA's information, there may have been sufficient information to arrest CARLOS

ZAPATA-HERNANDEZ.  However, the objectives of the investigation
were not to arrest or convict CARLOS ZAPATA-HERNANDEZ alone.  The
objectives of the wiretap were to identify, disrupt and dismantle
the entire drug trafficking organization, including its
suppliers, distributors, importers and drug and money couriers.
MEJIA possessed no information about the workings of the ZAPATA-
HERNANDEZ TARGET ORGANIZATION beyond MEJIA's individual
connection with his source of supply CARLOS ZAPATA-HERNANDEZ.

        The issue of whether MEJIA's information could meet the
objectives of the investigation was specifically addressed in
paragraph 182 and 183 of Exhibit 2.  In that paragraph the
affiant, Michael Moore of the Drug Enforcement Administration,
stated as follows:

        "your affiant did interview JESUS MEJIA, who is
        currently cooperating with law enforcement and provided
        significant information regarding the activities of
        CARLOS ZAPATA-HERNANDEZ.  MEJIA was not, however, able
        to provide information in regards to sources of supply
        or the command and control structure of the ZAPATA-
        HERNANDEZ ORGANIZATION.

        Moreover, MEJIA he is currently incarcerated and is
        unable to actively participate in any narcotics
        transaction.  Even if MEJIA were released, it is
        unlikely that CARLOS ZAPATA-HERNANDEZ would deal with
        him again without great suspicion."

        Affiant Moore also addressed the information provided
by JESUS MEJIA in the section regarding search warrants and
necessity which is found in paragraph 176-177 of Exhibit 2.
There, affiant Moore stated:

        "JESUS MEJIA has provided information that CARLOS

14

ZAPATA-HERNADEZ maintained drug ledgers at his
residence at 6575 Meade Court.  Therefore, your affiant
has considered executing a search warrant on this
residence to retrieve any such documents.  This search
warrant opportunity was rejected for the following
reasons.  First, MEJIA had limited knowledge of, and
has never actually seen the drugs records.  He did not
know the location of the records, the type of records
and the format in which those records are kept.
Therefore, your affiant is not confident that documents
supporting drug trafficking will actually be recovered
during the execution of a search warrant.

Your affiant is also aware that MEJIA has indicated
that CARLOS ZAPATA-HERNANDEZ has used his garage to
off-load narcotics and currency.  However, according to
MEJIA, these events are well timed and scheduled so
that any drugs and money do not remain in the residence
for an extended period of time.  Because your affiant
is not in a position to obtain real-time information
from an informant, it is probable that drugs and money
will not be recovered during the execution of a
warrant. An ill timed search warrant would only succeed
in alerting CARLOS ZAPATA-HERNANDEZ to the existence of
this investigation."

These paragraphs clearly show that JESUS MEJIA's
information did not provide admissible evidence which would
achieve all the objectives of the investigation as set forth in
paragraph 9 of the wiretap affidavit.

2.   <u>Argument As To Lyons and Maldonado</u>

The defendants also suggest that the seizure of 24
kilograms of cocaine from KENNETH LYONS and LETTY SIERRA DE
MALDONADO also achieved the objectives of the investigation.
This is also factually incorrect.

a. <u>Facts Surrounding The Seizure</u>

The information surrounding the arrest of LYONS and DE MALDONADO is set forth in paragraphs 35 through 45 of Exhibit 2. In summary, on December 11, 2003, Kansas Highway Patrol Trooper Jerett Ranieri stopped a 2004 Chevrolet Trail Blazer being driven by KENNETH LYONS and LETTY SIERRA DE MALDONADO.  A search of the spare tire of the vehicle revealed 21 kilogram size bricks of cocaine totaling 24 kilograms.  SIERRA DE MALDONADO and LYONS were arrested and taken into custody.  Neither defendant made any statements to the police regarding the cocaine. On December 13, 2003, LYONS and SIERRA DE MALDONADO were released on a $250,000.00 and failed to appear.  The two were later re-arrested after the completion of the wiretaps in this case.

At the time of arrest, a phone used by SIERRA DE MALDONADO showed that she had been in recent contact with CARLOS ZAPATA-HERNANDEZ.  On July 16, 2004, a fingerprint analysis report revealed that three latent prints found on the tape covering the kilogram packaging of the cocaine seized from LYONS matched the fingerprints provided by CARLOS ZAPATA-HERNANDEZ in his application for United States citizenship.

b.   <u>Information From Seizure Did Not Accomplish The Goals Of The Investigation</u>

While the information obtained from the seizure of narcotics from LYONS and DE MALDONADO did implicate CARLOS

16

ZAPATA-HERNANDEZ, the objectives of the investigation were not met because the objective was not to arrest CARLOS ZAPATA-HERNANDEZ.  Instead, as stated <u>supra</u>, the objectives were to identify, disrupt and dismantle the entire drug trafficking organization, including its suppliers, distributors, importers and drug and money couriers.  LYONS and DE MALDONADO did not agree to cooperate, did not make statements and then fled.  Therefore, agents were not in a position to interview them further regarding additional information on the ZAPATA-HERNANDEZ TARGET ORGANIZATION or to obtain additional information which might help achieve the objectives of the investigation.

3.   <u>Argument As To CS-1 and Necessity</u>

The defendants contend that the government possessed and "powerful investigative tool" that being an "informant with inner workings of the alleged drug enterprise."  This powerful tool was CS-1 who should have, according to the defendants, been sufficient to meet the goals of the investigation.  The defendants also assert that CS-1 was able to identify the structure of the organization.  This argument is factually incorrect.

a.   <u>Information Provided By CS-1</u>

As set forth in paragraphs 31 through 34 of Exhibit 2, in October 2000, CS-1 advised the DEA that CARLOS ZAPATA-HERNANDEZ was a member of an organization that distributed kilogram quantities of cocaine.  CS-1 stated that he/she observed

17

members of the ZAPATA-HERNANDEZ organization conduct

approximately five narcotics transactions, all of which occurred

in Colorado.  Specifically, during one of these transactions, CS-

1 observed a U-Haul truck with approximately 10 kilograms of

cocaine and one ton of marijuana.  CS-1 further identified other

members of the ZAPATA-HERNANDEZ conspiracy and their roles within

the organization.  Specifically, CS-1 stated that JOSE LUIS

ZAPATA-NEVANEZ and SERGIO ZAPATA-HERNANDEZ were lieutenants who

worked under the direction of CARLOS ZAPATA-HERNANDEZ.

> b.    The Information Provided By CS-1
>       Could Not Achieve the
>       Investigation's Objectives

AS the affidavit points out, CS-1 was not a powerful

tool.  Indeed, CS-1 was of limited historical value.  Affiant

Moore dealt with this issue in paragraph 150 of Exhibit 2.  There

Affaint Moore stated:

> "first, CS-1 provided limited information regarding the
> TARGET ORGANIZATION in the year 2000 and has not been
> involved with the group for a long-period of time.
> Thus, CS-1 does not possess current knowledge of the
> scope of the TARGET ORGANIZATION and could not be re-
> introduced to the ZAPATA-HERNANDEZ conspiracy without
> arousing suspicion."

As this paragraph points out, the limited information

provided by CS-1 could not have achieved the objectives of the

investigation because it was not current and CS-1 was not in a

position to re-enter the organization.  Indeed, one person

identified by CS-1 as being a critical part of the organization,

JOSE LUIS ZAPATA-NEVANEZ, was never intercepted during the course of the wiretap.  This evidences the fact that CS-1's information was dated and not sufficient to dismantle the entire organization.

4.   <u>Argument Relating To CS-FBI and UC-Sanin</u>

The defendants argue that the government was having success infiltrating the organization through the use of CS-FBI who made numerous recorded drug transactions with JOSE ANGEL PEREZ and through UC-Sanin who was able to get JOSE ANGEL PEREZ to contact his source.  This argument is factually incorrect.

a.   <u>Facts Relating To CS-FBI and UC-Sanin</u>

The facts surrounding the use of CS-FBI and UC-Sanin are set forth in detail in Exhibit 2 at paragraphs 72-117.  In summary, in February 2003, CS-FBI advised law enforcement agents that JOSE ANGEL PEREZ was distributing cocaine quarter-kilograms of cocaine.  CS-FBI agreed to make controlled purchases of cocaine from JOSE ANGEL PEREZ. CS-FBI made controlled purchases of cocaine from JOSE ANGEL PEREZ on February 4, 2003, May 22, 2003, September 22, 2003 and On December 18, 2003. The amounts of cocaine involved in these transactions were 245.5 grams, 248.73, 237.59 and 500.3 grams respectively.

An analysis of toll records from JOSE ANGEL PEREZ's cellular telephone revealed that he was in contact with SERGIO ZAPATA-HERNANDEZ during the time of the May 22, 2003, 1/4 kilogram transaction.

In addition to continued telephone contacts, surveillance of the September 22, 2003, deal showed that SERGIO ZAPATA-HERNANDEZ went to JOSE ANGEL PEREZ's apartment shortly before PEREZ's transaction with CS-FBI and that PEREZ went to SERGIO ZAPATA-HERNANDEZ residence immediately after the drug deal.

With respect to the December 18, 2003, deal between CS-FBI, UC-SANIN and JOSE ANGEL PEREZ, there were telephone contacts among and between PEREZ, FABIAN MIRANDA-URBINA and SERGIO ZAPATA-HERNANDEZ leading up to the sale of ½ a kilogram of cocaine.

> b.   CS-FBI and UC-Sanin Could Not Achieve
>      The Objectives of the Investigation

The government's position as to necessity and CS-FBI and UC-Sanin was set forth in the affidavit and can be found in Exhibit 2 at paragraphs 153-161 and 175.  Agent Moore admitted that the government was in a position to make controlled purchases from JOSE ANGEL PEREZ.  However, CS-FBI was unable to provide information that identified the routes or sources used by the ZAPATA-HERNANDEZ TARGET ORGANIZATION.  Additionally, as a customer, CS-FBI was not able to move into a position of trust within the ZAPATA-HERNANDEZ ORGANIZATION.

Agent Moore also advised Judge Weinshienk that CARLOS ZAPATA-HERNANDEZ was reluctant to deal with outsiders as demonstrated by the fact that, after the arrest of LETTY SIERRA DE MALDONADO, CARLOS ZAPATA-HERNANDEZ told JESUS MEJIA that he

did not want anyone but MEJIA to pick up the drugs from his residence.  Thus, Agent Moore concluded that it would be difficult and dangerous to attempt to introduce cooperating sources into the conspiracy.

Agent Moore also discussed the fact that the technique of using undercover agents was tried during the December 18, 2003, controlled purchase.  Agent Moore opined however, that continued undercover purchases by UC-Sanin would not advance the overall objectives of the investigation or allow him to deal directly with sources of supply.  This was due to the fact that during the meeting between UC-Sanin and PEREZ on February 17, 2004, PEREZ deliberately stepped away from UC-Sanin when he called his source, thus demonstrating that he was unwilling to introduce the undercover officer to his FABIAN MIRANDA-URBINA, SERGIO ZAPATA-HERNANDEZ or anyone else.

Based on the information set forth by Agent Moore, Judge Weinshienk concluded that there was necessity for the wiretap and that the objectives of the investigation had not been achieved through the use of CS-FBI or the use of UC-Sanin.

In conclusion, as a factual matter, the defendants are incorrect when they claim that these investigative tools were so successful in achieving the goals of the investigation and negated need for the wiretap.  For this reason alone, the motion to suppress should be denied.

C.   The Defendant's Argument's Are Legally Incorrect

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 government the use of wiretaps and the evidence obtained therefrom.  18 U.S.C. §§ 2510 et. seq. In order to prove that a wiretap is necessary, the government must show that traditional investigative techniques have been tried unsuccessfully, reasonably appear to be unsuccessful if tried, or are too dangerous to try. United States v. Ramirez-Encarnacion, 291 F.3d 1219, 1222 (10th Cir. 2002).  The traditional investigative techniques include (1) standard visual and aural surveillance; (2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity, if necessary); (3) use of search warrants; and (4) infiltration of conspiratorial groups by undercover agents or informants.  If any of these traditional investigative techniques have not been tried, the government must explain why with particularity. United States v. Mitchell, 274 F.3d 1307, 1310 (10th Cir. 2001).  The government must also explain its failure to use other techniques such as pen registers or trap and trace devices. United States v. Castillo-Garcia, 117 F.3d 1179, 1187-88 (10th Cir. 1977).  It should be noted that the Government's burden of showing that other procedures reasonably appear unlikely to succeed or that they are too dangerous to use is not a high one, in fact, "substantial compliance with the statute is all that is required." United States v. Sorapuru, 902 F. Supp.

1322 (D. Colo. 1995) (Sparr, J.), aff'd sub nom. United States v.
Bovie, 120 F.3d 271 (10th Cir.) (unpublished order), cert.
denied, 522 U.S. 1007 (1997).

A wiretap authorization is presumed proper and the
defendant bears the burden of proving that a wiretap in invalid
once it has been authorized.  United States v. Radcliff, 331 F.3d
1153, 1160 (10th Cir. 2003), United States v. Quintana, 70 F. 2d,
1167, 1169 (10th Cir. 1995).  The Court must examine all the
facts and circumstances in order to determine if the government's
showing of necessity was sufficient to justify the wiretap and
must read the requirements in a common sense fashion.  United
States v. Mack, 272 F. Supp. 2d 1174, 1178 (D. Colo. 2003),
United States v. Nunez, 877 F.2d 1470, 1472 (10th Cir. 1989).

1.   Partial Success Is Not Complete Success

The defendants' argument essentially boils down to a
claim that the government's evidence prior to the wiretap was
sufficient to achieve the objectives of the investigation.  This
argument is legally incorrect.

The TARGET ORGANIZATION in this case was made up of a
large group of family members and other individuals, some of whom
are now defendants indicted for their roles in the drug
conspiracy.  Every defendant has an understandable tendency to
define the investigation in terms of his own prosecution.  The
defendants, therefore, argue that because the Government had

23

enough evidence to indict or convict certain TARGET ORGANIZATION members without the use of the wiretap, the case should have ended there.  But the defendant's perspective and the government's perspective are not the same.  What the defendant sees as full success, the government views as partial success.

The Government's objectives were to use the wiretaps to gain "admissible evidence" which would prove the entire membership, structure and criminal activities of the entire organization.  This is a perfectly acceptable goal of a Title III investigation.  See, United States v. Crumpton, 54 F.Supp.2d. At 1007, United States v. Carrillo, 123 F.Supp.2d at 1248.  Yet, it is a goal which can be extremely difficult to achieve, particularly in cases such as this where the drug trafficking operation was extensive and sophisticated, involved numerous individuals who were acting simultaneously in several states across the country, and whose reach extended all the way into Mexico.

That is why, in a number of opinions, the Court has acknowledged the difficulties of conducting drug investigations and has observed that "drug trafficking is, by nature, difficult, to detect and presents formidable obstacles to identifying participants and determining their roles." Carrillo, at 1245, citing United States v. Velazquez-Feliciano, 107 F.Supp.2d. 134, 136 (D.P.R. 2000). See also, United States v. Newman, 733 F.2d 1395, 1399 (10th Cir. 1984), (holding that the determination of

the dimensions of an extensive drug conspiracy justifies the use of electronic surveillance").

Thus, in this type of extensive investigation, all that is required is that each affidavit relate real facts which specifically describe the difficulties encountered in penetrating the criminal conspiracy and gathering admissible evidence with normal techniques.  Carrillo, at 1245, citing United States v. Orakhi, 57 F.3rd at 1298.  Necessity may be established by showing that traditional techniques did not achieve all the objectives of the investigation, which may include the identification of all members of the conspiracy and determination of the scope of the conspiracy.  United States v. Carneiro, 861 F.2d at 1178 (necessity shown when traditional methods of investigation proved ineffective in revealing the sources and scope of the drug operation), United States v. Soraparu, 902 F.Supp. 1322, 1327 (D.Colo 1995)(holding that justification for the use of electronic surveillance include the identification of all the members of the conspiracy, learning the precise nature and scope of the illegal activity, the apprehension of accomplices, and the determination of the entire scope of the conspiracy).

In their argument, the defendants seek to mandate how far the Government should be allowed to go in pursuing its overall objective of dismantling and entire drug trafficking organization and ask the Court to weigh in on this issue as well.

25

However, it is the Government, and not the defendant, or even the
Court, that is empowered with decision-making as to defining the
objectives of an investigation or who the targets should be.
That is the exclusive province of the Government whose function
it is to decide, within legal limits, how to enforce the law.  As
Judge Sparr correctly stated in <u>Carrillo</u>:

> "a reviewing Judge is not an executive
> officer, vested with discretion over law
> enforcement policy and decisions.  Absent a
> violation of the Constitution or a federal
> statute, the reviewing Court cannot invade
> the province of the executive, whose function
> it is to enforce the law.  The Constitution
> empowers the judiciary to thwart the will of
> the other branches only when their behavior
> is not in accordance with law.  Accordingly
> selection of the targets and objectives of an
> investigation of a drug conspiracy is a law
> enforcement decision that is not
> appropriately made by the courts.

<u>Carrillo</u>, at 1250.

As long as the Government meets the necessity
requirements in each affidavit, and as long as the defined
objectives of the investigation have not been achieved, the
Government should be allowed to continue wiretapping until such
point as the Government can proceed no further.

It is clear from a review of the affidavits filed in
support of the wiretaps in this case that the objectives of the
investigation had not been met prior to the initiation of the
wiretap.  The defendants' arguments that the case was complete
and that the objectives had been met are without merit legally

and factually.  Therefore, the motions to suppress the wiretaps
should be denied.

> D.    <u>The Defendants Are Not Entitled To An Evidentiary
>        Hearing Absent A Showing Of A Franks Violation</u>

The defendants claim that they are entitled to an
evidentiary hearing on whether the government established
necessity for the wiretap.  This issue was first litigated and
decided in <u>United States v. Oregon-Cortez</u>, 244 F.Supp.2d 1167 (D.
Colo. 2003).  There, the government filed a motion to limit the
scope of the wiretap hearings and the defendants vigorously
opposed the motion.  Judge Daniel ruled that, under the Tenth
Circuit holding in <u>United States v. Ramirez-Encarnacion</u>,  the
standard was one of abuse of discretion and that the hearing
would be limited to an analysis of the four corners of the
affidavit.  The motion to limit the scope of the wiretap hearings
was then filed before United States District Judge Richard T.
Matsch in <u>United States v. Donovan Stallings et al.</u>, 03-CR-36-M.
A copy of Judge Daniel's opinion was attached to the motion and
Judge Matsch issued an oral opinion agreeing with Judge Daniel
and adopting the government's position.  The motion to limit the
wiretap hearing was next filed before Judge Walker D. Miller in
<u>United States v. Javier Munoz-Marquez et. al.</u>, 03-CR-179-WM (S-
1).  After oral argument on the issue, Judge Miller also agreed
with the government's position and filed a written order to that
effect.  Moreover, Judge Sparr, in <u>United States v. Mack</u>, 227 F.
Supp. 2d 1174, 1177, agreed with Judge Daniels ruling.  Indeed, a

four corners analysis of the wiretap affidavits has become the standard in this jurisdiction.

The government believes, based on statements made by the Court in the last hearing in this case, that the Court has already indicated its intent to proceed on a four corners basis. The government, therefore, adopts its position in <u>Oregon-Cortez</u> and reserves the right to file further briefing on this issue should the Court so direct.

**IV.   <u>CONCLUSION</u>**

For all the foregoing reasons, the government respectfully requests that the defendants' consolidated Motion To Suppress Wire Communications (filed at Docket Number 556-1) be denied in its entirety.

                    RESPECTFULLY SUBMITTED:


                    WILLIAM J. LEONE
                    UNITED STATES ATTORNEY
                    DISTRICT OF COLORADO

          By:   s/Stephanie Podolak
                    Stephanie Podolak
                    Assistant United States Attorney
                    U.S. Attorney's Office
                    1225 17th Street, Suite 700
                    Denver, CO. 80202
                    Telephone (303) 454-0309
                    Fax (303) 454-0401
                    Stephanie.podolak@usdoj.gov
                    Attorney For Government

## CERTIFICATE OF SERVICE

I hereby certify that on this 3ʳᵈ day of March, 2006, I electronically filed the foregoing **GOVERNMENT'S RESPONSE TO DEFENDANTS' CONSOLIDATED MOTION TO SUPPRESS INTERCEPTED WIRE COMMUNICATIONS (FILED AT DOCKET NUMBER 556-1)** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Richard Tegtmeier
richard@tegtmeierlaw.com

Jeff Pagliuca
Jeff@hollandandpagliuca.com

Mark Johnson
MarkJohnson297@hotmail.com

E. Richard Toray and Daniel Gerash
rtoray@gerashtoray.com

Richard Banta
bantacja@earthlink.net

Lisabeth Castle
Lawdenver@aol.com

Angelica B. Carreon
angelicacarreon@earthlink.net

Jennifer Gedde
jennifer@geddelaw.com

Harvey Steinberg
law@springer-and-steinberg.com

Martha Eskesen
meskesen@eskesenlaw.com

Scott Poland
scottpoland@earthlink.net

Don Lozow
apocock@lozow-lozow.com

Mike Root
mroot@mikerootlaw.com

James Scherer and Earl Sherwood Wylder
linda@waltergerash.com

Chuck Elliot
CWEMDEDME@aol.com

Mitch Baker
mitchbaker@estreet.com

Robert Driscoll
driscollrj101@aol.com

John Sullivan
jfslaw1@aol.com

s/Joyce Hegge
JOYCE HEGGE
Legal Assistant to Stephanie Podolak
U.S. Attorney's Office
1225 17th Street, Suite 700
Denver, CO 80202
Phone: (303) 454-0106
Fax: (303) 454-0401
E-mail: joyce.hegge@usdoj.gov