IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 04-cr-00403-LTB

UNITED STATES OF AMERICA,

        Plaintiff,

v.

1.    CARLOS ZAPATA-HERNANDEZ,
2.    SERGIO ZAPATA-HERNANDEZ,
     a/k/a "Tito,"
     a/k/a "Titillo," and
     a/k/a "Lucas,"
3.    FABIAN MIRANDA-URBINA,
     a/k/a "Chino,"
4.    ARNOLDO ZAPATA,
     a/k/a "Lolo,"
5.    JOSE ALFREDO ZAPATA,
     a/k/a "Alfredo,"
6.    JAIME ARMENDARIZ,
7.    RAMON ZAPATA,
8.    JAIME ZAPATA,
     a/k/a "Rudy,"
     a/k/a "Jimmy," and
     a/k/a "Chasco,"
9.    EFRAIN VENZOR,
10.  ALBERTO CABRAL,
     a/k/a "Beto," and
     a/k/a "Tio Beto,"
11.  ARTEMISA ZAPATA-MONTOYA,
12.  HUMBERTO GALVAN,
     a/k/a "Beto,"
13.  LILIAN GALVAN,
     a/k/a "Petunia," and
     a/k/a "Yiya,"
14.  BARBARA ZAPATA,
15.  OSCAR ZAPATA,
     a/k/a "Karin,"
16.  MICHAEL ROMERO,
     a/k/a "Mike,"
17.  RENE ALVAREZ,
18.  JOSE ANGEL PEREZ, and
     a/k/a "Primo,"

_____Defendants.

**GOVERNMENT'S NOTICE OF INTENT TO CALL EXPERT WITNESSES
TO ESTABLISH THE GENERAL PRACTICES OF THE ILLEGAL DRUG TRADE
AND THE MEANING OF CODE WORDS AND TERMS
IN THE CONTEXT OF DRUG TRADE
PURSUANT TO FED. R. CRIM. P. 16(a)(1)(E)
AND FED. R. EVID. 702**

THE UNITED STATES, THROUGH UNITED STATES ATTORNEY

WILLIAM J. LEONE, and Assistant United States Attorneys Stephanie

Podolak and Guy Till, hereby files this Notice, pursuant to Fed.

R. Crim. P. 16(a)(1)(E) and Fed. R. Evid. 702, designating

witnesses whose specialized knowledge of the general practices of

the drug trade and the use of code words and guarded language to

conduct drug trafficking operations, acquired by means of

training and experience, will assist the trier of fact to

understand the evidence or determine facts in issue in the above

styled case.

1.  Introduction.  The Tenth Circuit has repeatedly upheld

the admission of expert testimony concerning the general

practices of the drug trade and the use of code words, jargon,

and guarded speech to conduct illegal drug transactions.  In

United States v. Quintana, 70 F.3d 1167, (10th Cir. 1995), the

United States offered the testimony of a detective for the

purpose of interpreting for the jury various code words and

phrases used by the speakers on tape recordings from a wiretap.

The trial court allowed admission of the expert testimony, and

the Tenth Circuit affirmed, citing a long line of cases which included United States v. Garcia, 994 F.2d 1499 (10th Cir. 1993); United States v. Sturmoski, 971 F.2d 452, 459 (10th Cir. 1992); United States v. McDonald, 933 F.2d 1519, 1522-23 (10th Cir.), cert. denied, 502 U.S. 897 (1991); Specht v. Jensen, 853 F.2d 805 (10th Cir. 1988), cert. denied, 488 U.S. 1008 (1989). The Court stated, "this Court has repeatedly held that in narcotics cases, expert testimony can assist the jury in understanding transactions and terminology." Id. at 1171. The Court cited the following examples of interpretation by the detective; "ball" meaning 1/8 ounce of cocaine, "150 for 9" meaning $150 for every 9 ounces of cocaine handled by a third party on the defendant's behalf, and "8 and a half that has been stomped on" meaning 8 ½ ounces of cocaine which had been cut to reduce purity. The Court found that such testimony "clearly fell within the parameters of Rule 702 and precedent in this Circuit." Id. at 1171. See also United States v. Earl, 42 F.3d 1321 (10th Cir. 1994)(Expert testimony allowed to decipher seemingly innocent conversations between co-conspirators to aid the jury in determining whether the co-conspirators were using benign coded wording to converse about narcotics.).

The Advisory Committee Notes to Rule 702 (as amended and added to in 2000) state:

> [W]hen a law enforcement agent testifies
> regarding the use of code words in a drug

transaction, the principle used by the agent
is that participants in such transactions
regularly use code words to conceal the
nature of their activities.  The method used
by the agent is the application of extensive
experience to analyze the meaning of the
conversations.  So long as the principles and
methods are reliable and applied reliably to
the facts of the case, this type of testimony
should be admitted.

2.  <u>Drug trade and code word witnesses listed</u>.  The United

States hereby notifies the Court and counsel for defendants of

its intent to qualify the following witnesses as experts in the

area of the general practices of the illegal drug trade and the

use and meaning of code words or terms used in conversations

furthering illegal drug trade in this case and to elicit

testimony from the witnesses in the form of opinion or otherwise

as permitted under Fed. R. Evid. 701, 702, 703, 704 and/or 705.

The government's witnesses are listed here:

(1)   Drug Enforcement Administration (DEA) Supervisory

Special Agent (G/S) Ralph Villaruel; (2) DEA Special Agent (S/A)

Albert Villasousa; and (3)  Federal Bureau of Investigation (FBI)

Special Agent (S/A) Kim Buchanan.  Each witness may be called as

an expert witness in the areas of: (1) the general practices of

the illegal drug trade; (2) the meanings of certain drug related

terms; (3) coded language relating to the distribution of

cocaine; (4) coded language relating to the distribution of

narcotics proceeds; (5) coded language relating to fear of police

presence or surveillance; (6) ambiguous or veiled language used

4

by persons involved in drug distribution to conceal the true meaning of a conversation; (7) common units of sale of cocaine; and (8) words which indicate user quantities of narcotics verses distribution quantities of narcotics.

The government's drug trade and drug jargon expert witnesses may be called upon to render opinion testimony about the meanings of terms used in intercepted wiretap and other conversations, to explain the relation of specific terms and phrases to the general practices of the drug trade, as outlined in the Government's James Proffer previously filed in this case.

For purposes of illustration, at this time, some of the words or phrases on the recordings which will be addressed are listed here:

(1) "pretty girls" = good quality cociane

(2) "ugly girls" = poor quality cocaine

(3) "tickets" = money and narcotics

(4) "papers" = money

(5) "shoes" = a reference to cocaine and to an amount of cocaine

(6) "machine" = a kilogram of cocaine

(7) "corners" = a quarter-kilogram of cocaine

(8) "cement" = cocaine

(9) "spoken with the office" = contacting the cocaine source in Mexico

(10) "people are hungry" = customers needing cocaine

(11) "cement truck is on the way" = load of cocaine is en route from Mexico to Denver

(12) "lady wanted the posts" = customer wants a supply of cocaine

(13) "the trailer arrived with the posts" = the cocaine arriving into Denver

(14) "get the papers from under the pillow" = hide the money

(15) "things were ugly there at Carlos' house" = Carlos saw police surveillance and discussed it on the phone

(16) "drop off the papers" = deliver money

(17) "put the raffle tickets for eleven two-fifty" = amount of money owed

(18) "could we just do one" = request to purchase 1 kilogram of cocaine

(19) "borrow 2 tickets" = be provided with 2 kilos of cocaine

(20) "borrow a box of shoes" = request for a kilogram of cocaine

(21) "The whole box?" = entire kilogram of cocaine

(22) "The tires that were there at the house, they're for, for Lolo's truck, right? And Jose?" Carlos replied, "Yes, Arnoldo's and Jose Alfredo's, yes. There are two and two. There

are four."  Carlos then stated, "Yes, cause it was four and..and the tire you gave him separately and the one Efrain gave him made it six." = load of cocaine that had just arrived, discussing the kilograms of cocaine each person was to receive from the load

(23) "it was real ugly" = cocaine quality was poor

(24) "poor quality of the girls" = quality of the kilograms of cocaine was poor

(25) "boots were of bad quality with an ugly color and people were returning it" = poor quality of cocaine and cocaine customer dissatisfaction

(26) any "tile" left as he (Jaime) was missing a piece = Jaime needed some cocaine

(27) "have a complete toolbox" = a whole kilogram of cocaine

(28) "toolbox" was in corners = kilogram of cocaine has been divided into quarter kilogram quanitites

(29) "a whole yard" - whole kilogram of cocaine

(30)  Chino indicated he wanted the "machine"; Sergio asked which machine? Chino replied, "the scale" = drug scales

(31)  Jose Alfredo asked Carlos, "You want nine pesos? Should I put them in?"  Carlos replied, "Yes, between 8 and 9" = 8 and 9 kilograms of cocaine he needed to send to Denver

(32) Carlos asked if "they" had gone to the dance yet? = reference to the departure of drug couriers en route to Denver

(33) Jaime Armendariz told Carlos they were bringing the

tire that they brought the day before = reference to bringing the load of cocaine that was still secreted in a tire so they could break it out

(34)  "cousins would be arriving for dinner like the last time at Karin's" = reference to load of cocaine en route to Oscar Zapata's residence

(35) Arriving with 9 and 9 = Two shipments of nine kilograms each

(36) Chino asked Carlos if the "boots" that would be coming were size 8 or 9 to be ready? = reference to numbers of kilograms of cocaine being sent to Denver

(37) Carlos replied that it seemed like size 9, but between 8 and 9 = reference to numbers of kilograms of cocaine being sent to Denver

(38) "bring two tools" = 2 kilograms of cocaine

(39) "bring 2 toolboxes" = 2 kilograms of cocaine

(40)  Carlos asked Sergio if he thought that it would be better to bring 1 "goat" this weekend and 1 the next, or both "goats" that weekend? = should both loads of cocaine be transported at once

(41)  only missing "a box of tile" = 1 kilogram of cocaine

3. Expert Qualifications.  Supervisory Special Agent (G/S) Ralph Villarruel is a native Spanish speaker.  G/S Villarruel has been with the DEA for more than twenty years.  G/S Villarruel has

8

been stationed outside of the United States pursuant to his official duties as special agent of the DEA, including a tour of duty in the Republic of Mexico and in Peru. On occasion, G/S Villarruel has been stationed near the border of the United States with the Republic of Mexico during his career, including duty stations in Texas and Arizona. G/S Villarruel has participated in hundreds of narcotics investigations. G/S Villarruel has participated in undercover controlled purchases of quantities of cocaine, including undercover narcotics investigation work using the Spanish language. G/S Villarruel has participated in court authorized wiretaps, to include monitoring intercepted Spanish language conversations intended to facilitate illegal drug trade. Through his training and experience G/S Villarruel has become aware of the general practices of the drug trade, including practices around the acquisition, maintenance, transportation, bargained-for-exchange, delivery and distribution of narcotics and the related collection, movement and distribution of funds generated by narcotics trafficking. As a result of his extensive narcotics law enforcement experience targeting illegal narcotics dealers working in the English and Spanish languages, G/S Villarruel is able to explain the meaning, in context, of code words and other terms used in the illegal drug trade.

Special Agent Albert Villasousa has received a Bachelor of

Science degree from George Mason University, an Associates in Arts, Business Administration, from Miami-Dade Community College, and an Associates in Science, Communications Gathering and Exploitation, from the Community College of the Air Force.  S/A Villarousa has served in the United States Ariforce in the capacity of a Russian Crytogrologic Linguist and a Spanish Cryotologic Linguist.  Between January 1994 and June 1997, S/A Villasousa was employed as a contract Spanish linguist assigned to the DEA Special Operations Division.  Between June 1997 and October 1988, S/A Villasousa was a Site Supervisor for Diplomatic Language Services, supervising monitors/translators at the DEA Miami Field Divisiion.  From October 1998 to the present, S/A Villasousa has been employed by the DEA – he attended the DEA Basic Agent School at Qunatico, Va, in 19989 and has since been assigned oto the DEA Denver Field Division.  S/A Villasousa has been with the DEA as a Special Agent for more than seven years. S/A Villasousa is fluent in the English and Spanish languages. S/A Villasousa has participated in hundreds of narcotics investigations.  S/A Villasousa has participated in undercover controlled purchases of quantities of cocaine.  S/A Villasousa has participated in numerous court authorized wiretaps, to include monitoring intercepted Spanish language conversations intended to facilitate illegal drug trade.   Through his training and experience S/A Villasousa has become aware of the general

practices of the drug trade, including practices around the acquisition, maintenance, transportation, bargained-for-exchange, delivery and distribution of narcotics and the related collection, movement and distribution of funds generated by narcotics trafficking. As a result of his extensive narcotics law enforcement experience targeting illegal narcotics dealers working in the English and Spanish languages, S/A Villasousa is able to explain the meaning, in context, of code words, phrases, and other terms used in the illegal drug trade.

FBI Special Agent K. Buchanan has been with the FBI for more than 14 years and has been assigned to the investigation of drug offenses for approximately 9 years. Special Agent Buchanan has spent approximately 9 years concentrating on the prosecution of large-scale, multi-state, drug organizations. In particular, the majority of S/A Buchanan's cases have involved the importation of hundreds of kilograms of cocaine from Mexico into the United States and the distribution of that cocaine through multi-defendant, Hispanic drug organizations.

S/A Buchanan has been the lead case agent for or has assisted in more than 11 drug related wiretap investigations and has reviewed thousands of intercepted telephone calls in drug related cases. S/A Buchanan has also debriefed more than 100 cooperating defendants and confidential informants regarding code words used in telephone conversations to disguise discussion of

narcotics and drug proceeds.  The roles of the defendants and informants have ranged from being the source of supply to being a street level dealer.  In addition, Special Agent Buchanan has received training in the area of narcotics investigations at the FBI Training Facility in Quantico, Virginia.

As a result of this training and experience, including on the job training to include interviews with witnesses, former defendants, informants and others, S/A Buchanan has developed an expertise in the coded language used by these organizations and is knowledgeable in the divisions of labor, flows of narcotics, patterns of activity, methods of communication, methods of transportation, and the economics of the drug trade.

The government's witnesses have a protocol and methodology for deciphering and analyzing terminology used by drug distribution organizations including the ZAPATA-HERNANDEZ organization in this case.

4.  <u>Methodology Protocol</u>. Each government witness will testify by the application of extensive experience to analyze the meaning of the conversations.  For purposes of illustration, the following steps or factors could be employed:

> (a)  When first reviewing a recorded conversation, note who the speakers are and confirm whether they have criminal histories, including arrests and convictions and whether they have been known in the past to have dealt in drugs.  Also consider the speakers' employment status – particularly whether they are employed in the coded business (i.e., if the speakers are talking about

construction, are they in a legitimate construction related business). Consider information about known organization affiliation and the characteristics of the organizations with which the speakers may be associated, i.e., whether a particular organization is known for dealing a certain type or form of drugs.

(b)   Take into account any information about the words used in the conversation that may have been identified by or explained by confidential sources. In other words, determine whether a source has previously told me what a word or phrase means in the context of this drug investigation, or in any other drug investigation.

(c)   Analyze the context of the telephone call itself, taking into account the telephone calls that may have preceded the call in question and those that came after the questioned call, and the general subject matter of the call in question.

(d)   Note whether there is a commonly known code word which is being used along with any new or unfamiliar coded language. For instance, if the word "papers", a commonly used code meaning money, is used along with a word which is unfamiliar, providing a known context for the new term.

(e)   Review the call, with the coded language, with other agents assigned to the investigation utilizing their prior experience to determine if any other law enforcement personnel have previous experience with the specific code terminology.

(f)   Review any reports of surveillance occurring at or near the time of the call to see if anyone was followed/stopped/identified, which would assist in determining what the coded language meant. Look at whether certain evidence was seized from any individuals during a stop which might indicate what the coded language meant. Also review surveillance logs and video tapes at or near the time of the call to determine what occurred prior to and after the telephone call was made.

(g)   Evaluate prior intercepted telephone calls of the same speakers to determine whether the speakers

have used certain recognizable code words in the past in a same or similar situation as the questioned call.

(h)   Consider whether items recovered during search/arrest warrants would indicate the meaning of these terms.

(i)   Conduct interviews of defendants in investigations and specifically ask them about meanings of the various coded words and phrases, or topics, used and their meanings in the particular investigation.

With respect to the language and codes in the government's previously filed James Proffer and any other conversations involved in this case, the government's expert witnesses will testify to the general practices of the drug trade and will apply the expertise acquired from their training and experience as noted above and the protocols, principles and methodology to each telephone call intercepted in connection with this case (or to other recorded conversations) to determine what, in the expert witness's opinion, the code words and questioned phrases mean in the context of this investigation.

5.   Discussion of Legal Authority. Fed. R. Evid. 702 provides as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the

principles and methods reliably to the facts of
the case.

Rule 702 "imposes a special gatekeeping obligation on the
trial judge to ensure that an opinion offered by an expert is
reliable." <u>United States v. Charley</u>, 189 F.3d 1251, 1266 (10th
Cir. 1999), <u>cert</u>. <u>denied</u>, 528 U.S. 1098 (2000).  Rule 702 assigns
to the district court the role of gatekeeper and charges the
court with assuring that expert testimony "rests on a reliable
foundation and is relevant to the task at hand." <u>Daubert v.
Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 597; <u>see</u> <u>also</u> Fed.R.Evid.
104(a).  The gatekeeper role "entails a preliminary assessment of
whether the reasoning or methodology underlying the testimony is
. . . valid and of whether that reasoning or methodology properly
can be applied to the facts in issue." <u>Daubert</u>, 509 U.S. at
592-93.

As the Supreme Court made clear in <u>Kumho Tire Co. v.
Carmichael</u>, 526 U.S. 137, 149(1999) "where [expert] testimony's
factual basis, data, principles, methods, or their application
are called sufficiently into question . . . the trial judge must
determine whether the testimony has 'a reliable basis in the
knowledge and experience of [the relevant] discipline.' "
(quoting <u>Daubert</u> at 592).  In <u>Kumho</u> the Supreme Court stated
that the district court's duty to act as gatekeeper and to assure
the reliability of proffered expert testimony before admitting it
applies to all (not just scientific) expert testimony.  <u>Id</u>. at

15

147.

As the Application Note to Rule 702 states, "a review of the caselaw after <u>Daubert</u> shows that the rejection of expert testimony is the exception rather than the rule.  <u>Daubert</u> did not work a 'seachange over federal evidence law' and 'the trial court's role as gatekeeper' is not intended to serve as a replacement for the adversary system."  Further, the Note states, "[T]his amendment is not intended to provide an excuse for an automatic challenge to the testimony of every expert."

In a case such as this one, where a Special Agent is offered as an expert to interpret coded language involved in wiretap interceptions, the Special Agent is most often challenged in the area of her interpretations of new words and phrases, terms not previously known to her and perhaps unique to the case at hand. The challenge generally calls for a showing that the new interpretations are supported by a reliable method or methods for arriving at the expert opinion of meaning.  See <u>United States v. Hermanek</u>, 289 F.3d 1076, 1092-1097 (9th Cir. 2002).  Readily admissible expert testimony, from the gatekeeping perspective, would include the expert Special Agent's interpretations of words "commonly used" in the drug trade -- words with which the officer is already familiar by virtue of her expert qualifications and experience.

Each of the government's expert witnesses have extensive

experience and knowledge of drug terminology based on many years
investigating the cocaine importation and distribution business
and interpreting hundreds of intercepted communications.  The
witnesses' training and experience are highly relevant,
especially to conversations which are not so much about technical
"code" *per se*, but which are purposefully veiled and obtuse
communications about ongoing events taking place during drug
distribution activities.  See <u>United States v. Dukagjini</u>, 326
F.3d 45, 50 (2nd Cir. 2003)("As is common in drug conspiracy
cases, most of the conversations on tape were disguised and
ambiguous" – trial court properly permitted DEA Special Agent to
testify to "words of the trade, jargon" and general practices of
drug dealers.)

When a conversation involves true "code" words or phrases,
training and experience are not always sufficient to establish
the reliability of interpretations of new words and phrases.  It
is well settled that bare qualifications alone cannot always
establish the admissibility of certain kinds of scientific expert
testimony. <u>See</u> <u>Daubert</u> at 1315 (holding that expert testimony was
inadmissible based on its unreliable methodology notwithstanding
"the impressive qualifications of plaintiffs' experts").

Therefore, the government's expert witnesses use the
methodology described above, reviewing each intercepted call to
determine first, whether code words, phrases or veiled language

are being used, and, if so, to determine what the questioned language means.  See United States v. Rincon, 28 F.3d 921, 924 (9th Cir.1994) (explaining that the methods used by the expert must be described "in sufficient detail" such that the district court can determine if they are reliable); Fed.R.Evid. 702 advisory committee's note (2000) ("The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted.  The . . . expert must explain how the conclusion is so grounded.").

6.  Conclusion.  The trial judge has broad discretion "to determine reliability in light of the particular facts and circumstances of the particular case." Id. at 158; see also Charley, 189 F.3d at 1266.  The trial judge enjoys broad discretion in both deciding how to assess an expert's reliability, including what procedures to utilize in making that assessment, as well as in making the ultimate determination of reliability. Kumho Tire, 526 U.S. at 152, 119 S.Ct. 1167; see also Hynes v. Energy West, Inc., 211 F.3d 1193, 1203- 05 (10th Cir.2000); United States v. Velarde,  214 F.3d 1204, 1208-09 (10th Cir 2000).

Therefore, expert interpretation from a law enforcement officer with proper credentials such as G/S Villaruel, S/A Villasousa, or S/A Buchanan, is appropriate to explain the

ambiguities and code words contained in the intercepted or recorded conversations to jurors – the jury members have likely never engaged in such vague conversations specifically to conceal the illegal nature of the circumstances being discussed. Expert testimony can be helpful to understand the usage of seemingly common words for clandestine purposes in the drug trade as well as the use of jargon characteristic to the drug trade. Even common words may require interpretation. As noted by the Seventh Circuit in United States v. Ceballos, 302 F.3d 679, 685-688 (7th Cir. 2002), calling an expert law enforcement officer is proper to:

> . . . offer expert testimony on the meaning of pronouns such as "it" and "them" because the pronouns were used in an ambiguous manner and because of the agents' vast experience with drug code language. Further, this testimony was helpful to the jurors because "[a]s a result of [the agents' expert] testimony, the jury was able to apply to the evidence alternative theories of which they ordinarily would not have been aware." United States v. Sanchez-Galvez, 33 F.3d 829, 832 (7th Cir.1994). Finally, our conclusion regarding the admissibility of the agents' testimony is bolstered by the holding in Nersesian, whereby the court affirmed the district court's acceptance of a DEA agent's testimony that "the excessive use of pronouns" signaled a drug-related conversation. See 824 F.2d at 1307-08.

Id. The original Advisory Committee Notes to Rule 702 stated, "It will continue to be permissible for the experts to take the further step of suggesting the inference which should be drawn

from applying the specialized knowledge to the facts." Neither _Daubert_ nor _Kuhmo_ changed this premise.

Each government expert witness will be prepared to apply both his or her training and experience and the above described principles and methodology to the words and phrases contained in intercepted telephone calls, or in other conversations relating to this case and which are deemed admissible by the Court.

RESPECTFULLY SUBMITTED THIS 17TH DAY OF MAY 2006:

> WILLIAM J. LEONE
> UNITED STATES ATTORNEY
> DISTRICT OF COLORADO
>
>
> By: s/Stephanie Podolak
> STEPHANIE PODOLAK
> Assistant United States Attorney
> U.S. Attorney's Office
> 1225 17th Street, Suite 700
> Denver, CO. 80202
> Telephone (303) 454-0309
> Fax (303) 454-0401
> stephanie.podolak@usdoj.gov
> Attorney for Government
>
> By: s/Guy Till
> GUY TILL
> Assistant United States Attorney
> U.S. Attorney's Office
> 1225 17th Street, Suite 700
> Denver, CO. 80202
> Telephone (303) 454-0207
> Fax (303) 454-0401
> guy.till@usdoj.gov
> Attorney for Government

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of May, 2006, I electronically filed the foregoing **GOVERNMENT'S NOTICE OF INTENT TO CALL EXPERT WITNESSES TO ESTABLISH THE GENERAL PRACTICES OF THE ILLEGAL DRUG TRADE AND THE MEANING OF CODE WORDS AND TERMS IN THE CONTEXT OF DRUG TRADE PURSUANT TO FED. R. CRIM. P. 16(a)(1)(E)AND FED. R. EVID. 702** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Richard Tegtmeier
richard@tegtmeierlaw.com

Jeff Pagliuca
Jeff@hollandandpagliuca.com

Mark Johnson
MarkJohnson297@hotmail.com

E. Richard Toray and Daniel Gerash
rtoray@gerashtoray.com

Richard Banta
bantacja@earthlink.net

Lisabeth Castle
Lawdenver@aol.com

Angelica B. Carreon
angelicacarreon@earthlink.net

Jennifer Gedde
jennifer@geddelaw.com

Harvey Steinberg and Christopher Leach
law@springer-and-steinberg.com

Martha Eskesen
meskesen@eskesenlaw.com

Scott Poland
scottpoland@qwest.net

Don Lozow
apocock@lozow-lozow.com

Mike Root
mroot@mikerootlaw.com

James Scherer and Earl Sherwood Wylder
linda@waltergerash.com

Chuck Elliot
CWEMDEDME@aol.com

Mitch Baker
mitchbaker@estreet.com

Robert Driscoll
driscollrj101@aol.com

John Sullivan
jfslaw1@aol.com

s/Joyce Hegge
JOYCE HEGGE
Legal Assistant to Stephanie Podolak
U.S. Attorney's Office
1225 17th Street, Suite 700
Denver, CO 80202
Phone: (303) 454-0106
Fax: (303) 454-0401
E-mail: joyce.hegge@usdoj.gov